# IN THE SUPREME COURT OF THE STATE OF IDAHO

## Docket No. 48092

E. BRUCE STANGER, MICHAEL R. STANGER and KIMBERLY STANGER KVAMME, dba SOMETIMES A GREAT NOTION LAND AND CATTLE COMPANY, a partnership,

    Plaintiffs-Counterdefendants-Respondents,

v.

WALKER LAND & CATTLE, LLC, an Idaho limited liability company,

    Defendant-Counterclaimant-Appellant,

and

VISTA VALLEY AG, INC., an Idaho corporation,

    Defendant.

Boise, September 2021 Term

Opinion filed: November 22, 2021

Melanie Gagnepain, Clerk

---

Appeal from the District Court of the Seventh Judicial District of the State of Idaho, Bonneville County. Bruce L. Pickett, District Judge.

The judgment of the district court is <u>affirmed</u>.

Cooper & Larsen, Pocatello, for Appellant. Gary Cooper argued.

Beard St. Clair Gaffney PA, Idaho Falls, for Respondents. Lance Schuster argued.

---

MOELLER, Justice

    This appeal concerns a farm lease between Walker Land & Cattle, LLC, ("Walker") and Sometimes a Great Notion Land and Cattle Company ("SAGN"). The lease agreement required Walker, as tenant, to obtain insurance coverage on "improvements" upon the Ririe Farm, which SAGN, as landlord, contends included the property's five irrigation pivots. Below, the district

1

court granted summary judgment to SAGN, concluding that under the lease agreement irrigation pivots are improvements and Walker defaulted on the lease by failing to provide insurance on the pivots. On appeal, Walker raises several related issues, primarily contending that genuine issues of material fact barred granting summary judgment. For the following reasons, we affirm the award of summary judgment by the district court.

## I. FACTUAL AND PROCEDURAL BACKGROUND

SAGN and Walker have done business with each other for years, particularly concerning two properties co-owned by the parties: Tract I (known as the Osgood Farm) and Tract II (known as the Ririe Farm). The Ririe Farm property is a 720-acre plot used primarily for raising potatoes. A system of pumps, five pivots, multiple hand lines, and additional equipment irrigates most of the Ririe Farm's acreage. *See* Figure 1, *infra*. The five center pivots each attach to concrete pads that are connected to the irrigation pumps and mainline in order to distribute water to the crops. This irrigation system has remained in place on the Ririe Farm for the last forty years.



**Figure 1. Map of the Ririe Farm.**

SAGN is a general partnership consisting of three partners who are siblings: E. Bruce Stanger, Michael R. Stanger, and Kimberly S. Stanger Kvamme. Walker is also a family company with a farming history spanning fifty years growing alfalfa, potatoes, and grain. Walker became an Idaho limited liability company in April 2004. Over the years, SAGN and Walker have continued both tenancy-in-common and landlord-tenant relationships through various leases.

On August 2, 2012, SAGN and Walker entered into a lease agreement concerning the jointly owned Osgood and Ririe Farms. Problems began about a year later, in November 2013,

when Walker filed a petition for Chapter 11 bankruptcy. During the bankruptcy proceedings, Walker indicated its intention to assume the 2012 lease and continue its operations on both the Osgood and Ririe Farm properties. While SAGN did not terminate the 2012 lease, it expressed concerns to the bankruptcy court about continuing in business with Walker, stating it "[could not] afford to jeopardize its farm lands." The bankruptcy court, however, entered an order confirming Walker's plan for reorganization, which included Walker's assumption of the 2012 lease.

As part of an effort to sell the Osgood Farm—and help fund the bankruptcy plan for reorganization—SAGN and Walker amended their lease agreement on April 25, 2016. The 2016 partition and lease agreement ended the co-tenancy and transferred ownership interests in the two farms. SAGN transferred its undivided half interest in the Osgood Farm to Walker, while Walker transferred its undivided half interest in the Ririe Farm to SAGN. Some of the lease provisions in the 2016 agreement were merely restated from the 2012 agreement, while others were new. Relevant to this appeal, the material provisions were as follows:

> A. Landlord [SAGN] hereby agrees to transfer via warranty deed its undivided ½ interest in [the Osgood Farm] to Tennant [Walker], together with all water rights associated with [the Osgood Farm], and the buildings, fixtures, and other improvements located thereon.
>
> B. Tenant hereby agrees to transfer via warranty deed its undivided ½ interest in [the Ririe Farm] to Landlord, together with all water rights associated with [the Ririe Farm], and the buildings, fixtures, and other improvements located thereon. The potato cellar and irrigation systems on [the Ririe Farm] shall continue to be subject to the provisions of the Lease Agreement as modified herein below.
>
> . . .
>
> 4.1 Right to Use: Lessee shall have the sole and exclusive use of all of the irrigation equipment, including, but not limited to, pumps, motors, pivots, panels and pads, now situated on the leasehold; said usage to run concurrently with this lease and any renewal thereof.
>
> 4.1A Ownership. Except as otherwise provide [sic] herein, on and after January 31, 2027, Landlord and Tenant shall jointly own an undivided one-half interest in the irrigation systems, installed upon [the Ririe Farm], together with any pumps, motors, pivots, panels and pads; however it being understood that such ownership shall pass to Lessor, in its entirety upon expiration of the lease term and any renewal thereof or termination of the lease.
>
> . . .
>
> 6.2 Care of Leasehold: Lessee shall use its best efforts to make and keep [the Ririe Farm] free and clear of all rubbish, willows, and other weeds and noxious growths generally considered by the Agricultural Extension Services of the University of Idaho and Idaho State University to be foul, obnoxious or objectionable to good farming practices. Lessee

shall further keep all potato cellars, granaries, shops, labor houses and domestic wells in good repair, reasonable wear and tear excepted; and, further, Lessee shall repair, at its expense, the irrigation system.

. . .

7.3 Other Insurance: Lessee, at its sole cost and expense, shall purchase and maintain a policy of insurance covering the repair and/or replacement of any improvements upon the Leasehold, most particularly the potato cellar, in an amount sufficient to replace such improvements; . . .

15. Lessee's Default: In the event Lessee defaults in observance or performance of any term or provision of the Lease, Lessor, after at least Thirty (30) days written notice to Lessee, may, but need not, remedy such default or terminate this Lease; provided, however, that Lessor shall have the right to remedy such default without notice in the event of an emergency. . . .

16. Remedies In The Event of Lessee's Default: Upon the occurrence of any event set forth in the preceding Section (15), Lessor may take any of the following actions or avail itself of the following rights:

. . . 16.2 Termination: The right to declare this Lease at an end and terminated, and to sue for all rents, other monies owed and damages accrued though [*sic*] the date of termination.

. . .

19.5 Additional Improvements: All improvements contemplated by this Agreement run with the land.

19.6 Condition of Leasehold: Lessee acknowledges that it has inspected [the Ririe Farm] and is familiar with its condition, having farmed the same for a number of years under prior leases. Lessee accepts [the Ririe Farm] "AS IS," with no warranty of condition, express or implied, as to [the Ririe Farm], the potato cellar, the irrigation system or any other improvement to or upon [the Ririe Farm], having been given by Lessor.

The lease did not define the term "improvements."

Soon after signing the amended lease agreement, Walker entered into a sublease agreement with Vista Valley Ag, Inc. ("Vista Valley"), a company managing multiple farming and ranching operations. Boyd Foster is the owner of Vista Valley. According to Foster's deposition, Vista Valley continued to irrigate the Ririe Farm in the same manner as it was when it entered the sublease with Walker, but wanted to update the irrigation system soon to improve farming operations. In the spring of 2018, SAGN, Walker, and Vista Valley met in Idaho Falls to discuss possible improvements to the Ririe Farm, including a plan to purchase new pivots and upgrade the irrigation system. At this time, SAGN claimed it discovered "serious deficiencies" in Walker's performance under the lease, including its failure to insure the five existing pivots.

On April 25, 2018, SAGN notified Walker it was in default of its lease obligations, having found "deficiencies with the potato cellar, the pivots, the water rights, a fuel storage tank, and the insurance." A flurry of activity commenced on the Ririe Farm with Walker "bec[oming] very active in remedying these defaults" over the next 30 days; however Walker did not procure insurance for the pivots. Nevertheless, on June 8, 2018, SAGN filed this lawsuit against Walker for breach of contract, declaratory judgment, quiet title to the Ririe Farm, and a writ of ejectment. Walker counterclaimed for declaratory judgment, breach of contract, and intentional interference with contract. Walker also filed a lis pendens against the Ririe Farm property. Following commencement of this lawsuit, Vista Valley terminated its sublease agreement with Walker, claiming these issues interfered with its "quiet enjoyment of the Ririe Farm."

Early in the proceedings, SAGN filed a motion for summary judgment on the issue of default, which the district court granted. The district court concluded that because there was no dispute of fact as to Walker's default, SAGN had the right to terminate the lease pursuant to the amended agreement. Thus, SAGN was entitled to summary judgment as a matter of law. While SAGN had asserted that there were several grounds for default, the district court's decision centered on whether Walker defaulted on the lease by failing to provide insurance on the pivots. The district court noted that the lease required insurance "covering the repair and/or replacement of any improvements upon [the Ririe Farm], most particularly the potato cellar." The district court concluded that the terms of the lease indicated that the irrigation system—including the pivots— "was to be considered an improvement upon the land." Inasmuch as Walker failed to insure the pivots, the default provisions of the amended lease agreement permitted SAGN, after giving Walker due notice and a thirty-day period to remedy the default, to terminate the lease. The district court also concluded that Walker's failure to repair the irrigation system—regardless of the condition it was received in—constituted a default under section 6.2 of the lease. The district court concluded that disputed issues of fact as to the remaining alleged defaults prevented it from granting summary judgment on the alternate grounds.

Following summary judgment, SAGN was granted leave by the district court to amend its complaint to include counts for slander of title (due to the lis pendens Walker filed) and for claim and delivery (for the potato cellar rent). SAGN then filed a second motion for summary judgment, seeking dismissal of Walker's remaining claims and summary judgment on its own claims for slander of title and claim and delivery. Walker moved for reconsideration of the first summary

judgment decision. Additional discovery by the parties ensued, primarily regarding irrigation repairs, insurance coverage, and the potato cellar. Walker submitted invoices and receipts showing irrigation repairs from 2016 to 2018. These receipts included purchases of new parts, hydraulic motor oil, wheel repair, sprinklers, and requisite service work. This evidence was submitted to support Walker's contention that it had completed irrigation repairs and maintenance pursuant to the lease. However, while the new evidence showed that there was liability and insurance coverage for the farming operations, including the irrigation pumps, it is undisputed that there was no insurance coverage on the five pivots.

During the initial stages of this litigation, the potato cellar remained in use for the 2018 to 2019 storage season, allowing Vista Valley to harvest and store their existing crops. Because both SAGN and Walker were asking for the rent check, Vista deposited the $18,000 rent payment into its attorney's trust account, to be distributed after judgment at the end of the dispute. In 2019, Vista Valley also entered into a separate agreement with SAGN for use of the cellar with the promise that the rent would be released to the proper party following litigation.

SAGN next filed a third motion for summary judgment, asking the district court for a declaratory judgment that Walker defaulted on the lease by failing to adequately insure the potato cellar pursuant to the agreement.

The district court issued its decisions on SAGN's two pending motions for summary judgment and Walker's motion for reconsideration at the same time. With regard to SAGN's second and third motions for summary judgment, the district court granted the second motion for summary judgment, concluding that because Walker lacked ownership or leasehold interests in the potato cellar, it was not entitled to receive rents to SAGN's cellar.[1] The district court denied the third motion for summary judgment because disputed facts in the record prevented it from interpreting the applicable, but ambiguous, insurance terms regarding the potato cellar. There were disputed facts and conflicting expert testimony in the record as to the policy amount Walker should have had for the cellar, and the district court concluded it could not weigh that evidence at summary judgment to determine the correct interpretation of "replacement cost insurance" and other relevant terms.

The district court also denied Walker's motion for reconsideration. On the question of whether Walker defaulted on the lease by failing to repair the irrigation system, the district court

---

[1] By then, SAGN had withdrawn its slander of title claim.

6

found a question of fact as to whether Vista Valley assumed that obligation through its sublease. However, the district court reiterated its previous ruling that the pivots were improvements on the Ririe Farm that required insurance under the amended lease agreement. Thus, that default, the district court explained, permitted SAGN to terminate the lease and made the award of summary judgment proper.

The district court's final judgment awarded SAGN all right, title, and interest to the Ririe Farm, ejected Walker from the premises, and awarded judgment of $18,000 (plus interest) for rent of the potato cellar. The district court also awarded attorney fees to SAGN as the prevailing party, but reduced the requested amount after examining the applicable factors listed under Idaho Rule of Civil Procedure 54(e). The final attorney fees and costs totaled $84,683.14. Walker timely appealed all of the district court's decisions.

## II. STANDARD OF REVIEW

This case presents a question of contract interpretation. "The existence of ambiguity determines the standard of review of a lower court's interpretation of a contract or instrument." *Dr. James Cool, D.D.S. v. Mountainview Landowners Co-op. Ass'n, Inc.*, 139 Idaho 770, 772, 86 P.3d 484, 486 (2004). For example, "the legal effect of an unambiguous written document must be decided by the trial court as a question of law." *Latham v. Garner*, 105 Idaho 854, 857, 673 P.2d 1048, 1051 (1983). On the other hand, when "the instrument of conveyance is ambiguous, interpretation of the instrument is a matter of fact for the trier of fact." *Id.* An instrument is ambiguous where it is "reasonably subject to conflicting interpretation." *Id.* at 858, 673 P.2d at 1052. Determining whether the contract is ambiguous is also a question of law. *Dr. James Cool, D.D.S.*, 139 Idaho at 772, 86 P.3d at 486.

Where questions of law are reviewed "in the context of a summary judgment order, we review the record de novo," applying the same standard used by the trial court in ruling on the motion. *Noell Indus., Inc. v. Idaho State Tax Comm'n*, 167 Idaho 367, 470 P.3d 1176, 1180 (2020), *reh'g denied* (Aug. 14, 2020), *cert. denied*, 141 S. Ct. 1391 (2021). *See also Lee v. Willow Creek Ranch Ests. No. 2 Subdivision Homeowners' Ass'n, Inc.*, 164 Idaho 396, 399, 431 P.3d 4, 7 (2018). Thus, where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law," the court must grant summary judgment. I.R.C.P. 56(a). " 'Summary judgment is appropriate if the pleadings, affidavits, and discovery documents on file with the court, read in a light most favorable to the nonmoving party,

demonstrate no material issue of fact such that the moving party is entitled to a judgment as a matter of law.' " *Lee*, 164 Idaho at 399, 431 P.3d at 7 (quoting *Partout v. Harper*, 145 Idaho 683, 685, 183 P.3d 771, 773 (2008)). If there is no genuine dispute as to any material fact, all that remains is a question of law over which this Court exercises free review. *Id.*

### III. ANALYSIS

**A. The district court did not err in concluding that the irrigation pivots were "improvements" under the amended lease agreement.**

Walker argues that because the insurance requirement in the lease agreement is ambiguous, the district court erred in construing the language on a motion for summary judgment. To this point, Walker contends that when determining whether the pivots are an improvement, the pivots should be considered separately from the irrigation system as a whole, based on the holding in *Steel Farms, Inc. v. Croft & Reed, Inc.*, 154 Idaho 259, 297 P.3d 222 (2012). In its analysis, the district court concluded that the lease unambiguously indicates that the pivots were to be considered improvements upon the land, and the lease agreement plainly required all improvements to be insured by Walker. We concur in this analysis.

When interpreting a contract, a court's primary objective is to discover the mutual intent of the parties at the time they entered the contract. *Hap Taylor & Sons, Inc. v. Summerwind Partners, LLC*, 157 Idaho 600, 610, 338 P.3d 1204, 1214 (2014). If the terms of the contract are unambiguous, intent can be ascertained as a matter of law by looking to the four corners of the document. *Id.* Subjective, undisclosed intent is immaterial to a contract's interpretation. *J.R. Simplot Co. v. Bosen*, 144 Idaho 611, 614, 167 P.3d 748, 751 (2006). Rather, the court gives " 'force and effect to the words of the contract without regard to what the parties to the contract thought it meant or what they actually intended for it to mean.' " *Id.* (quoting 17 Am.Jur.2d, Contracts, § 347 (2004)).

Only where an instrument is "reasonably subject to conflicting interpretation," is it ambiguous and inappropriate for decision on a motion for summary judgment due to the factual determinations that must be made. *Hap Taylor & Sons, Inc.,*157 Idaho at 610, 338 P.3d at 1214. The meaning of relevant, ambiguous terms are left to the fact finder. *Id.* Thus, where the contract is ambiguous, intent can be divined "by looking at the contract as a whole, the language used in the document, the circumstances under which it was made, the objective and purpose of the particular provision, and any construction placed upon it by the contracting parties as shown by their conduct or dealings." *Bosen*, 144 Idaho at 614, 167 P.3d at 751.

8

Despite the lack of a definitions section in the agreement, the 2016 lease has several relevant provisions that guide our interpretation of the lease term "improvements." The first provision is section 7.3, which states: "Lessee, at its sole cost and expense, shall purchase and maintain a policy of insurance covering the repair and/or replacement *of any improvements* upon the Leasehold, most particularly the potato cellar, in an amount sufficient to replace such *improvements*; . . . " (emphasis added). Thus, under the lease agreement, Walker was plainly responsible for obtaining insurance coverage for "any improvements upon [the Ririe Farm]" "at its sole cost and expense." Next, section 4.1 states: "Lessee shall have the sole and exclusive use of all of the irrigation equipment, including, but not limited to, pumps, motors, *pivots*, panels and pads. . ." This provision expressly identifies pivots as part of the irrigation equipment. Finally, section 19.6 states: "Lessee accepts [the Ririe Farm] 'AS IS,' with no warranty of condition, express or implied, as to [the Ririe Farm], the potato cellar, *the irrigation system or any other improvement* to or upon [the Ririe Farm], having been given by Lessor." (emphasis added). This provision expressly names the irrigation equipment—which includes the pivots—among the listed improvements on the Ririe Farm. Reading the lease as a whole, the language is plain and clear on its face: the lease agreement treats the entire irrigation system, including its varying components, as an improvement on the land.

Our conclusion is consistent with Idaho case law defining "improvements." Generally, leasehold improvements enhance or augment the value or quality of the real property. *Stapleton v. Jack Cushman Drilling & Pump Co. Inc.*, 153 Idaho 735, 738, 291 P.3d 418, 421 (2012). *See also West v. El Paso Prod. Co.*, 122 Idaho 133, 136, 832 P.2d 306, 309 (1992) (explaining that improvements enhance or augment real property, which includes "lands and '[t]hat which is affixed to land.' ") (citing I.C. § 55-101); *Leasehold Improvements*, BLACK'S LAW DICTIONARY (11th ed. 2019) (defining leasehold improvements as beneficial changes made by, or for the benefit of, the lessee). For instance, we have held that a well is an improvement to real property. *Stapleton*, 153 Idaho at 738, 291 P.3d at 421. Deciding whether something is an improvement to the real property remains a question of law for the court. *West*, 122 Idaho at 136, 832 P.2d at 309.

Here, the five pivots on the Ririe Farm were anchored to the ground on concrete pivot pads, which were affixed and appurtenant to the property. A riser pipe on each pivot is attached to the mainline and pumps. Together, these components form a complex and integrated irrigation system. *See* Figure 1, *supra*. Without the center pivots, water could not be distributed to the crops as it has

9

for the last forty years. The pivots are obviously an integral, substantial, and vital part of the farm's irrigation system. Accordingly, the five pivots would be considered improvements under the law because they augment the affixed irrigation structures and provide the benefit of irrigation to land that would be otherwise incapable of producing crops. Undoubtedly, an irrigated property is worth more than a non-irrigated property, particularly in an arid region where irrigation is essential to agriculture.

Walker points to *Steel Farms* to argue that the pivots are personal property to be considered separately—arguing that the pivots are not fixtures or annexations meant to be considered "improvements." However, the holding in *Steel Farms* does not alter our analysis. In *Steel Farms*, this Court instructed that the various and unique components of an irrigation system can be separately assessed to determine whether each part is a fixture or personal property. 154 Idaho at 268, 297 P.3d at 231. Here, however, we need not conduct such an exercise. The question presented by this case is not whether the pivots are fixtures or personal property, but whether the lease agreement's plain language includes the irrigation pivots as *improvements* upon the land requiring insurance. We conclude that it does.

This is a reasonable construction of the lease agreement. Here, the pivots enhanced the value of the whole irrigation system by allowing it to autonomously distribute water to the crops in the fields as needed. These are generally large, complex, and substantial structures that are not easily transported from farm to farm, or even field to field. Unlike other irrigation delivery systems, such as hand lines or wheel lines, pivots are typically installed with the intent to leave them in place for years, just as Ririe Farm's pivot system was in place for four decades. Thus, the district court properly granted summary judgment because under the lease agreement, the five pivots of Ririe Farm are undoubtedly improvements requiring insurance coverage.

## B. The district court did not err in concluding that SAGN properly terminated the lease agreement due to Walker's default.

Walker next contends that even if the Court concludes the lease required insurance on the pivots, termination of the lease was improper despite the default because no material breach occurred. We disagree. Idaho law is clear that "[c]ourts do not possess the roving power to rewrite contracts in order to make them more equitable." *Bakker v. Thunder Spring-Wareham, LLC*, 141 Idaho 185, 191, 108 P.3d 332, 338 (2005) (quoting *Lovey v. Regence BlueShield of Idaho*, 139 Idaho 37, 41, 72 P.3d 877, 881 (2003)). Equity will not intervene to change a contract's terms

10

"unless it produces unconscionable harm, is unlawful or violates public policy." *Smith v. Idaho State Univ. Fed. Credit Union*, 114 Idaho 680, 684, 760 P.2d 19, 23 (1988).

According to the lease agreement, Walker's default "in observance or performance of any term or provision of the Lease," permitted SAGN, as landlord, to give notice of termination with a thirty-day period for time to remedy the default. Additional provisions likewise permitted Walker, as tenant, to give notice of termination where the lessor, SAGN, "defaults in observance or performance." In short, a default by Walker triggers SAGN's termination rights, just as a default by SAGN would have triggered Walker's termination rights. This is the agreement entered into by both parties. Nowhere does the lease require a "material breach" as grounds for termination. By its own terms, default on "any term or provision" is sufficient.

Ultimately, Walker is essentially inviting this Court to create a new rule of contract law—one which would equate default language with a material breach of other terms of a contract. We decline the invitation. Even if we were to delve into the materiality of the default provision at issue here, the necessity of the insurance provisions is clear and important to the property owner leasing its property. Ensuring that its tenant conducts business responsibly, especially given the disruption of the prior agreement due to Walker's recent bankruptcy, was clearly a material concern to SAGN. Assuring that the five center pivots and the rest of the irrigation system—typically the sole source of water for arid farmlands and an essential part of ensuring mature crops for harvest—were insured was material to this lease. Likewise, pursuant to the terms of the lease agreement, SAGN had a future interest in those pivots, which it would own outright at the end of the lease. Insurance coverage protected that future interest. Therefore, we do not agree with Walker's contention that, under the terms of this lease, the insurance requirements on the pivots were not sufficiently material to warrant termination of the lease pursuant to its default provisions. Because Walker defaulted on these provisions, SAGN was entitled to terminate the agreement. We affirm the district court's decision granting summary judgment in favor of SAGN on its default claim.

## C. The district court did not err in concluding that SAGN is entitled to rent for the potato cellar.

Following the first award of summary judgment, SAGN amended its complaint to pursue a claim and delivery remedy for the $18,000 potato cellar rent under Idaho Code section 8-302. Walker contends the district court erroneously disregarded the elements of Idaho Code section 8-302 in its analysis, and that SAGN's pursuit of a claim-and-delivery remedy was wholly improper. The district court, however, did not decide the issue on the grounds of claim and delivery. Instead,

11

it reasoned that the termination of Walker's lease also terminated its rights to sublease the Ririe Farm and potato cellar to Vista Valley, leaving SAGN as the only party with ownership and leasehold interests in the potato cellar. We agree with the district court's reasoning.

Here and below, Walker argued that its sublease agreement with Vista Valley was the only instrument that permitted rent for the potato cellar, particularly as Walker paid SAGN rent for the 2018 farm year. The lease between SAGN and Walker permitted the lessor to complete the crop year following termination. Following termination of the lease between SAGN and Walker, SAGN permitted Vista Valley to complete the crop year on the Ririe Farm and to harvest and store the crops. Vista Valley had already terminated its sublease with Walker. Thereafter, it entered a new agreement with SAGN permitting Vista Valley to rent the potato cellar for storage through the 2018 to 2019 winter season. The district court concluded that because Walker defaulted on the lease agreement with SAGN, Walker "did not have any ownership or leasehold interest in the cellar, and therefore, [Walker was] not entitled to benefit from rents derived from the use of the potato cellar that SAGN owned." Following termination of the lease agreement, only SAGN had rights to the potato cellar and to any rents derived from its use.[2] Thus, we affirm the district court's findings and judgment award of the potato cellar rent.

### D. The district court did not err in its award of attorney fees to SAGN.

Walker also contests the district court's award of $82,000 in attorney fees below, arguing that the district court failed to explain its reasoning and application of the factors under Idaho Rule of Civil Procedure 54(e)(3). That rule instructs:

> If the court grants attorney fees to a party or parties in a civil action it must consider the following in determining the amount of such fees:
>
> (A) the time and labor required;
>
> (B) the novelty and difficulty of the questions;
>
> (C) the skill requisite to perform the legal service properly and the experience and ability of the attorney in the particular field of law;
>
> (D) the prevailing charges for like work;
>
> (E) whether the fee is fixed or contingent;
>
> (F) the time limitations imposed by the client or the circumstances of the case;
>
> (G) the amount involved and the results obtained;

---

[2] On appeal, Walker has not argued that he is entitled to a pro rata share of the rent for the period of time preceding its default of the lease.

(H) the undesirability of the case;

(I) the nature and length of the professional relationship with the client;

(J) awards in similar cases;

(K) the reasonable cost of automated legal research (Computer Assisted Legal Research), if the court finds it was reasonably necessary in preparing a party's case;

(L) any other factor which the court deems appropriate in the particular case.

I.R.C.P. 54(e)(3). The calculation of reasonable attorney fees is within the discretion of the trial court. *Frizzell v. DeYoung*, 167 Idaho 801, 812, 477 P.3d 236, 247 (2020). A court must always consider these factors in awarding fees; however, a court must only explain its reasoning in a written decision where a timely objection is made. *Id.* (citing I.R.C.P. 54(e)(7)).

Idaho Code section 12-120(3) states, "the prevailing party" of any civil action concerning a commercial transaction "shall be allowed a reasonable attorney's fee to be set by the court, to be taxed and collected as costs." There is no dispute that this is a case concerning a commercial transaction, nor that SAGN prevailed before the trial court. Walker only argues that the attorney fees were not awarded in compliance with Idaho Rule of Civil Procedure 54(e)(3).

Here, the district court included its reasoning and application of the various factors in its written decision to award fees pursuant to Idaho Code section 12-120(3). The district court specifically considered the nature of this case, the invoiced hours and work completed by the attorneys, similar charges for this type of case, the novelty of the issues raised, the fixed fees charged, the desirability of the case, the relationship counsel maintained with SAGN, the costs of legal research, and so on. Additionally, the district court substantially reduced the fees originally requested by SAGN from $126,000 to $82,000 upon determining that the amount was too high for the nature of the case and the work completed.[3] In reading the district court's decision on fees and costs, the district court appears to have applied each of the Rule 54(e)(3) factors appropriately and with due consideration. Accordingly, we affirm the district court's award of attorney fees below.

### E. Attorney Fees on Appeal

Each party claims it is entitled to attorney fees and costs on appeal under Idaho Code section 12-120(3), which grants attorney fees to a prevailing party in any case concerning a commercial transaction. Neither party disputes that this is a case concerning a commercial

---

[3] In its briefing on appeal, Walker notes that it suggested a reduction in fees from the district court "to approximately $75,000 – $76,000."

transaction. It concerned a lease agreement for a farm property, making the contract commercial in nature. Accordingly, as the prevailing party in this appeal, SAGN is entitled to attorney fees pursuant to section 12-120(3).

## IV. CONCLUSION

For the reasons set forth above, we affirm the decision of the district court concluding that under the lease agreement, the irrigation pivots were improvements on the Ririe Farm. Because Walker failed to provide insurance on the pivots, as required under the agreement, the district court properly concluded Walker was in default. Therefore, SAGN was permitted to terminate the agreement. Accordingly, we affirm the judgment of the district court in all respects. We also award attorney fees to SAGN pursuant to Idaho Code section 12-120(3). SAGN is also entitled to costs as a matter of course under Idaho Appellate Rule 40(a).

Chief Justice BEVAN, and Justices BRODY, STEGNER and ZAHN **CONCUR.**